# United States Court of Appeals
## For the First Circuit

No. 10-2412

UNITED STATES OF AMERICA,

Appellee,

v.

DWIGHT PANETO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lipez, Selya and Howard, Circuit Judges.

Mary S. McElroy, Assistant Federal Defender, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief, for appellee.

November 22, 2011

**SELYA**, **Circuit Judge**.  Having been found guilty of knowingly and intentionally possessing a firearm as a convicted felon, defendant-appellant Dwight Paneto complains that the lower court erred both in refusing to suppress certain evidence and in calculating his guideline sentencing range (GSR).  His merits claim raises a knife-edge question concerning the scope of the plain view exception to the warrant requirement of the Fourth Amendment, and his sentencing claim requires us to clarify the reach of USSG §2K2.1(b)(6).  Concluding, as we do, that no reversible error occurred, we affirm the judgment below.

## I.  BACKGROUND

We sketch the origins and travel of the case, reserving more exegetic factual detail for our later discussion of the assignments of error.

On August 19, 2009, the narcotics unit of the Providence, Rhode Island, Police Department mounted an operation designed to probe street-level drug trafficking in a crime-riddled neighborhood of the city.  Events that took place in the course of the operation (to which we shortly shall return) led to a plainclothes officer's purchase of drugs through a third party and a subsequent confrontation at the defendant's home.  After seizing drugs, a gun, and ammunition, they took the defendant into custody.

As matters turned out, the defendant had a number of prior felony convictions.  With this information in hand, a federal

-2-

grand jury returned a two-count indictment charging the defendant with being a felon in possession of a firearm, see 18 U.S.C. § 922(g)(1), and possessing with intent to distribute cocaine base (crack cocaine), see 21 U.S.C. § 841(a)(1).  The defendant moved unsuccessfully to suppress the evidence recovered during the search of his home.  A trial jury rendered a split decision; it convicted the defendant on the gun charge but acquitted him on the drug-trafficking charge.  The district court imposed an 84-month incarcerative sentence.  This timely appeal followed.

## II.  ANALYSIS

We bifurcate our ensuing discussion, turning first to the defendant's claim that the district court erred in denying his suppression motion and then proceeding to address his claim of sentencing error.

### A.  Suppression.

In reviewing the denial of a motion to suppress, "we accept the [trial] court's findings of fact unless clearly erroneous and evaluate its legal conclusions de novo."  United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001).  This is a standard that counsels respect for both the trial court's factual findings and the inferences drawn by the court from the discerned facts.  See United States v. Hughes, 640 F.3d 428, 434 (1st Cir. 2011).

-3-

For purposes of this appeal, the events leading up to the defendant's arrest are of paramount importance. We rehearse the relevant facts as supportably found by the district court. See United States v. Lee, 317 F.3d 26, 30 (1st Cir. 2003).

The central figure in the police action was Detective Nicholas Ludovici. During the run-up to the arrest, Ludovici — dressed in civilian garb — was cruising the neighborhood in an unmarked car. He intended to drive around, aimlessly and at a slow rate of speed, in anticipation that someone would think him to be looking for a "fix" and offer to sell him drugs. Other officers, supporting Ludovici's mission, were lurking nearby.

In the early afternoon, a stranger (later identified as Deshawn Owens) hailed Ludovici from the sidewalk. Ludovici pulled over to the curb, Owens got into the car, and Ludovici told him that he was looking for a "straight 20" (street slang for a $20 bag of crack cocaine). Owens replied that he would take Ludovici to his "boy's house" and identified his "boy" as "D." Owens then directed Ludovici to a house at 103 Laura Street. Since Ludovici, unbeknownst to Owens, had activated his cellular telephone's two-way function, the conversation between the two men was overheard by three other officers, all of whom proceeded to the designated destination.

Once Ludovici had pulled to the curb on Laura Street, Owens asked him for the purchase money. Ludovici gave Owens a $20

bill that he had pre-marked with a small ink slash through the zero in the figure "20" appearing in the upper right corner. Owens exited the car, entered the building, left briefly to visit a nearby shop, reentered the house, and eventually returned to the car. Once inside, he handed Ludovici a clear plastic bag containing crack cocaine.

Ludovici started to drive Owens back toward their original meeting place. En route, he covertly signaled his support crew. The other officers joined him and took Owens into custody. Thereafter, three of them (including Ludovici) repaired to Laura Street. They walked to the front door of the multi-family dwelling at 103 Laura Street. When they entered the structure, they observed the landlord painting in the stairwell. Ludovici, displaying his badge, inquired whether anyone had recently gone in and out. The landlord pointed to the third-floor apartment.

The officers decided to conduct a "knock and talk," a maneuver in which officers who have not yet secured a warrant go to investigate a suspected crime and determine whether the suspect will cooperate. See Hughes, 640 F.3d at 431. They knocked on the door of what proved to be the defendant's apartment. The defendant opened the portal, the officers identified themselves, and the defendant invited them in. The defendant was not alone; his girlfriend, two of his children, and a teenage family friend were

also inside the residence. A menagerie of reptiles and other animals completed the ensemble.

The front door of the apartment opened into what appeared to be the living room. Once the defendant ushered the officers into a side room, Ludovici noticed a $20 bill on a coffee table. He immediately believed this to be the marked bill that he had given Owens to fund the drug buy and said as much. He bent to pick it up, confirmed the presence of the mark, and seized it. He proceeded to administer <u>Miranda</u> warnings to the defendant. <u>See</u> <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436, 473-74 (1966).

The defendant protested that the money was not his and told the officers that they were free to search the apartment. He signed both a waiver of his <u>Miranda</u> rights and a consent-to-search form.

As the search progressed, Ludovici picked up and opened a small canister perched on the coffee table. He found two more bags of cocaine (similar to the one that he had just purchased). With this contraband in hand, he asked the defendant if he had anything else hidden in the apartment. The defendant replied that there was a gun in a safe. The safe, located in a bedroom, proved difficult to open. Finally, with help from the defendant's girlfriend, the officers opened it and seized an unloaded 9mm Beretta. In that same bedroom, the officers found under a mattress

-6-

a magazine containing six rounds of compatible ammunition.[1]  The arrest and indictment followed apace.

This brings us to the defendant's motion to suppress the evidence recovered from his home.  Pertinently, he argued that both the consent to search and the fruits of the search itself were tainted by Ludovici's earlier manipulation of the $20 bill.  The government countered that the evidence had been lawfully seized.

After a three-day evidentiary hearing, the district court, ruling ore tenus, denied the motion to suppress.  The court avoided the plain view issue, instead holding that the inevitable discovery doctrine, see Nix v. Williams, 467 U.S. 431, 446-47 (1984), validated the prosecution's use of the evidence seized.

While we respect the views of the able district judge, we are mindful that the inevitable discovery doctrine is a doctrine of last resort.  Ideally, it should be invoked only when evidence is otherwise unlawfully obtained.  See Lee, 317 F.3d at 34 & n.3. Here, the district court's application of the inevitable discovery doctrine is problematic and, in any event, the plain view issue is sufficiently clear that there is no good reason to bypass it. Consequently, we exercise our authority to choose a ground of decision different from that chosen by the court below, see United

---

[1] For present purposes, we take the facts as recounted above. Although the defendant offered a much different version at the suppression hearing, the district court rejected his account.  On appeal, the defendant does not challenge this factual finding.

<u>States</u> v. <u>Sowers</u>, 136 F.3d 24, 28 (1st Cir. 1998), and go directly to the plain view question.

The defendant's claim of error is grounded in the Fourth Amendment proscription against "unreasonable searches and seizures." U.S. Const. amend. IV. He asseverates that Ludovici's handling of the bill, which antedated any consent, amounted to an unconstitutional search.

The Fourth Amendment ordinarily requires police officers to secure a warrant prior to effecting a search or seizure. In the absence of a warrant, the officers' acts must fall within one of the exceptions to the warrant requirement. One such exception is for items in plain view. A police officer, even though he does not have a search warrant, may seize an object in plain view as long as he has lawfully reached the vantage point from which he sees the object, has probable cause to support his seizure of that object, and has a right of access to the object itself.[2] <u>United States</u> v. <u>Sanchez</u>, 612 F.3d 1, 4-5 (1st Cir. 2010). A challenge to a search of an object in plain view calls for a slightly different analytic rubric. When an officer seeks to manipulate an object in plain sight, the relevant inquiry becomes whether "the 'plain view'

---

[2] The plain view exception also applies in situations in which officers have a warrant, but the area searched is outside the scope of the warrant. <u>See</u> <u>Horton</u> v. <u>California</u>, 496 U.S. 128, 140-42 (1990). That branch of the doctrine is not at issue here.

doctrine would have sustained a seizure of the [object itself]." Arizona v. Hicks, 480 U.S. 321, 326 (1987).

In this case, the object in question — the $20 bill — was visible to the naked eye during a lawful entry into the premises. Thus, Ludovici's handling of the bill satisfies the first prong of the plain view test. His actions also satisfy the third prong of the test; the bill was out in the open, and his access to it was unrestricted. The decisive requirement, then, is the second prong: whether he had probable cause to manipulate the object. See id.

In general terms, probable cause exists when police have sufficient reason to believe that they have come across evidence of a crime. Texas v. Brown, 460 U.S. 730, 742 (1983); United States v. Curzi, 867 F.2d 36, 45 (1st Cir. 1989). "In the 'plain view' context, this means that probable cause exists when the incriminating character of [the] object is immediately apparent to the police." Sanchez, 612 F.3d at 5. The officer need not be certain of the incriminating character of an object, but, rather, must have a belief based on a "practical, nontechnical probability" that the object is evidence of a crime. United States v. Giannetta, 909 F.2d 571, 579 (1st Cir. 1990) (internal quotation marks omitted).

The probable cause standard was satisfied here. Even if we assume, favorably to the defendant, that Ludovici's lifting of

the bill to eye level constituted a search,[3] he had probable cause to handle the bill.  We explain briefly.

Ludovici immediately identified the bill as his marked money before lifting it up.  This was confirmed by another officer on the scene, a defense witness, and the defendant himself.  In addition, Ludovici knew that Owens had gone into the apartment and returned with drugs; that Owens had identified his source by an initial — "D" — which corresponded to the defendant's first name; that the defendant, when opening the door, had referred to himself as "D"; and that the clearly visible denomination of the bill matched the denomination of the "bait" bill that he had given to Owens.  Moreover, the $20 bill spied by Ludovici stood out; there is no evidence that any other currency was in sight.  The fact that people usually keep bills of large denominations — such as a $20 bill — in wallets or purses, not simply lying around, adds to the reasonableness of Ludovici's belief.  These facts, taken in the aggregate, gave rise to a reasonable degree of probability that the $20 bill, which Ludovici spied on the coffee table, was evidence of

---

[3] The act of picking up the bill and peering at it may not have constituted a "search" at all.  Under Hicks, it is clear that the Fourth Amendment forbids handling an item to expose something hidden, but it is far from clear that the Fourth Amendment prohibits moving an item merely to magnify or confirm something already visible.  See Hicks, 480 U.S. at 325 (stating that "taking action . . . which exposed to view concealed portions of the apartment or its contents" constituted a search).  Here, neither party disputes that had Ludovici merely bent over to get a closer look at the bill without picking it up, there would be no constitutional infirmity.

the crime to which Ludovici had just been privy.[4]  Its seizure was therefore lawful; the defendant's consent to the ensuing search was untainted; and the fruits of that search were not subject to suppression.

## B. <u>Sentencing</u>.

The defendant's second claim of error relates to sentencing.  Cognizant that the defendant had one prior felony conviction for a crime of violence and another for a controlled substance offense, the district court set his base offense level at 24.  <u>See</u> USSG §2K2.1(a)(2).  The court then adjusted upward by two levels for obstruction of justice (premised on a finding that the defendant had testified falsely during the suppression hearing), <u>see</u> <u>id.</u> §3C1.1, and by four levels for possession of a firearm in connection with another felony, <u>see</u> <u>id.</u> §2K2.1(b)(6).  Paired with a criminal history category of VI, the total offense level yielded a GSR of 168 to 210 months, which exceeded the ten-year statutory maximum for the offense of conviction.  <u>See</u> 18 U.S.C. § 924(a)(2).  The court proceeded to impose an 84-month incarcerative sentence.

The federal sentencing guidelines are advisory, not mandatory.  <u>See</u> <u>United States</u> v. <u>Booker</u>, 543 U.S. 220, 245 (2005).  Nevertheless, the GSR remains the conventional starting point for

---

[4] The defendant points out that there is no evidence that the marked side of the bill was face up when Ludovici first spotted it. That is true, but it does not undermine our conclusion that, in the totality of the circumstances, Ludovici had probable cause to believe that the bill was his.

constructing a federal sentence. See United States v. Martin, 520 F.3d 87, 91 (1st Cir. 2008). A sentencing court is obligated to calculate the GSR correctly, and a defendant may challenge an incorrect guideline calculation even if the court imposes a sentence that is below the bottom of the range. See United States v. Gobbi, 471 F.3d 302, 313 & n.7 (1st Cir. 2006). In evaluating the correctness of guideline calculations, we review factual findings for clear error and legal rulings interpreting or applying the sentencing guidelines de novo. United States v. Pacheco, 489 F.3d 40, 44 (1st Cir. 2007).

In the case at hand, the defendant challenges only a single aspect of the district court's guideline calculations: the four-level enhancement under section 2K2.1(b)(6). To warrant such an adjustment, the sentencing court must supportably find that the defendant "used or possessed any firearm or ammunition in connection with another felony offense." USSG §2K2.1(b)(6).

Where, as here, the defendant has been convicted of unlawfully possessing a firearm, this guideline requires two subsidiary findings. First, the court must find that the defendant possessed the firearm "in connection with" another offense. Id. §2K2.1, comment. (n.14(A)). Second, it must supportably find that the additional offense is a felony qualifying for the enhancement. Id. §2K2.1, comment. (n.14(C)).

-12-

The government has the burden of proving these two elements by a preponderance of the evidence. United States v. Damon, 595 F.3d 395, 399 (1st Cir. 2010). The district court concluded that the government had carried its burden of proving both that the defendant had committed a qualifying second felony (possessing and dealing drugs) and that he possessed the seized firearm "in connection with" that second felony. The defendant challenges each of these findings.

a. **The Other Felony**. To begin, the defendant protests that he was not selling drugs and hails his acquittal on the drug trafficking charge as the proof of the pudding. This is whistling past the graveyard. In a criminal case guilt must be proven beyond a reasonable doubt, but sentencing factors need only be proven by a preponderance of the evidence. See United States v. Watts, 519 U.S. 148, 156 (1997). Given this dichotomy, a sentencing court may consider acquitted conduct in determining the applicability vel non of a sentencing enhancement. See Gobbi, 471 F.3d at 313-14.

Here, moreover, there was sufficient evidence in the record to support the sentencing court's determination that the defendant was engaged in felonious drug trafficking. The police found other drugs in a container near the $20 bill that had just been used in a drug transaction. Owens testified at trial that he purchased the crack cocaine from the defendant. The defendant, who had no verifiable income or assets, routinely paid his expenses,

-13-

presumably including the cost of the drugs that he admitted to using on a regular basis, in cash. Last, but far from least, the court was entitled to take into account that the defendant had a prior felony conviction for distributing crack cocaine. See United States v. Cannon, 589 F.3d 514, 518-19 (1st Cir. 2009).

We have written before, and today reaffirm, that "[a] sentencing court is entitled to rely on circumstantial evidence and draw plausible inferences therefrom." United States v. Marceau, 554 F.3d 24, 32 (1st Cir. 2009) (citations omitted). The court below had before it both direct and circumstantial evidence of the defendant's drug dealing. On this record, we cannot say that the court's determination that the defendant was engaged in drug dealing was clearly erroneous.[5]

**b.** **The Connection**. The next question is whether the evidence supports the sentencing court's finding that the defendant possessed the firearm "in connection with" the discerned drug trafficking felony. The defendant points out that the gun was not loaded; that it was locked inside a safe that could not be opened

---

[5] Although the district court found that the defendant was engaged in both felony drug possession and felony drug trafficking, we think it advisable to focus on the latter. If the "second felony" was for drug possession alone, that might affect our interpretation of the relevant guideline because the critical part of the application note, by its terms, applies only to "drug trafficking offense[s]." USSG §2K2.1, comment. (n.14(B)). We previously have left open the question of whether having a firearm in connection with a simple drug possession offense is sufficient to trigger an enhancement under USSG §2K2.1(b)(6), Cannon, 589 F.3d at 520 n.4, and we have no need to answer that question today.

without both a key and a combination (and then, only with some difficulty); that the ammunition was kept separately from the gun; and that the gun and ammunition were found in a room other than the room in which the drugs were hidden. Further, he labors to draw an analogy between this case and the earlier case of United States v. Ellis, 168 F.3d 558 (1st Cir. 1999). These arguments are unavailing.

We previously have considered the application of section 2K2.1(b)(6). We first addressed the current language of this provision in United States v. Brewster, 1 F.3d 51 (1st Cir. 1993).[6] Both then and thereafter, we typically have given the phrase "in connection with" its plain and broad meaning. See id. at 54; see also United States v. Thompson, 32 F.3d 1, 7 (1st Cir. 1994). We have stated, for example, that application of the enhancement does not require either actual use of the weapon during commission of the felony or physical proximity between the weapon and the contraband. Thompson, 32 F.3d at 8. Withal, we have recognized that the coincidental presence of a gun near a crime scene ordinarily will not suffice to ground the enhancement. See, e.g., United States v. Sturtevant, 62 F.3d 33, 34-35 (1st Cir. 1995) (per curiam) (noting that the guideline would not apply to "an

---

[6] Prior to 2006, section 2K2.1(b)(6) was part of section 2K2.1(b)(5), as reflected in some of our earlier decisions. See, e.g., Brewster, 1 F.3d at 52 & n.1. For ease of exposition, we refer to the guideline in its current form.

accountant who, while forging checks, happens to have a gun in the desk drawer").  The key question is whether a "sufficient nexus exists between the weapon and the [additional felony]."  Brewster, 1 F.3d at 54.  If a firearm "somehow aids or facilitates, or has the potential to aid or facilitate, the commission of another offense," application of the guideline is warranted.  Thompson, 32 F.3d at 6.

In Brewster, 1 F.3d at 54, we noted the "dearth of expository comment" illuminating the meaning of "in connection with."  The passage of time has filled this void.  In 2006, the Sentencing Commission provided much-needed guidance about the meaning of section 2K2.1(b)(6).

The Commission adopted what is now Application Note 14. See USSG §2K2.1, comment. (n.14); Amendments to the Sentencing Guidelines Effective Nov. 1, 2006, 71 Fed. Reg. 28,063, 28,069-71 (submitted May 15, 2006).  The new application note sheds a bright light on the scope of the phrase "in connection with" and confirms that the guideline applies when the firearm "facilitate[s], or ha[s] the potential of facilitating, another felony offense." USSG §2K2.1, comment. (n.14(A)).  Pertinently, the application note adds a second clarification, explicitly stating that, "in the case of a drug trafficking offense," there is a sufficient nexus between the gun and the offense when the "firearm is found in close proximity" to the drugs.  Id. §2K2.1, comment. (n.14(B)) (emphasis supplied).

-16-

The adoption of this application note places a particularly helpful gloss on section 2K2.1(b)(6) in cases involving drug trafficking felonies. The application note is neither inconsistent with, nor an obviously erroneous reading of, the guideline. We must, therefore, take it fully into account. See Stinson v. United States, 508 U.S. 36, 38 (1993); United States v. Piper, 35 F.3d 611, 617 (1st Cir. 1994).

We read the guideline through the prism of Application Note 14. We hold that, in a situation in which the additional felony is drug trafficking, the guideline means that the enhancement is appropriate whenever the firearm is in close proximity to the drugs.[7] The commentary explains that this is the proper test because the mere presence of a firearm during a drug transaction has the potential of facilitating that felony offense. See USSG §2K2.1, comment. (n.14(B)).

That ends this aspect of the matter. In this case, the government established that the defendant had the gun in the same small single-floor apartment as the bagged cocaine. That is enough to support a finding of "close proximity." See United States v. Peterson, 233 F.3d 101, 111 (1st Cir. 2000) (finding "close

---

[7] Ellis does not alter this conclusion. See 168 F.3d at 563-64. That case involved a different though similar guideline provision affecting armed career criminals. See USSG §4B1.4(b)(3)(A). Moreover, the decision predates the Sentencing Commission's clarification of section 2K2.1(b)(6) and is therefore inapropos.

proximity" between drugs and guns located in the same apartment). Such a finding makes especially good sense here because the gun was in the defendant's home in a room near the drug stash and the home served as the defendant's place of business for carrying out what the district court supportably found to be drug trafficking activities. The gun, therefore, had the potential to facilitate the drug distribution offense "by emboldening the enterprise, aiding the collection of a drug debt, or in any number of foreseeable ways." Cannon, 589 F.3d at 519.

In an effort to blunt the force of this reasoning, the defendant notes that the gun was neither loaded nor readily accessible. This is true as far as it goes, but it does not take the defendant very far.

Simply put, the guideline, as clarified by Application Note 14, dictates that where, as here, the second felony is a drug trafficking offense, close proximity is all that is required. See, e.g., United States v. Jenkins, 566 F.3d 160, 163 (4th Cir. 2009); United States v. Blankenship, 552 F.3d 703, 704-05 (8th Cir. 2009). This makes eminently good sense. An unloaded gun can easily be loaded and, thus, has the potential to facilitate a drug trafficking operation. And in all events, a gun need not be loaded in order to facilitate drug trafficking.[8] See United States v.

_____

[8] We hasten to add that in cases other than those involving drug trafficking, facts such as whether a firearm is operable, whether it is loaded, and whether it is accessible deserve due

-18-

<u>Rhind</u>, 289 F.3d 690, 695 (11th Cir. 2002) (suggesting that "criminals frequently use unloaded guns to execute crimes").

The short of it is that the defendant kept a gun in close proximity to a stash of drugs, and the district court supportably found that he possessed the gun in connection with his activities as a drug trafficker. That finding was not clearly erroneous and, for that reason, the application of the four-level enhancement under section 2K2.1(b)(6) was appropriate.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we affirm the defendant's conviction and sentence.

**Affirmed**.

---

consideration in deciding whether a gun is possessed "in connection with" a crime. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Guiheen</u>, 594 F.3d 589, 591-92 (8th Cir. 2010). But even then, such factors, by themselves, are not dispositive.