# United States Court of Appeals
## For the First Circuit

No. 16-1103

UNITED STATES OF AMERICA,

Appellee,

v.

SHERAD THERRIEN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

Larry J. Ritchie for appellant.
Julie M. Karaba, Attorney, United States Department of
Justice, with whom Carmen M. Ortiz, United States Attorney, was on
brief, for appellee.

January 27, 2017

**STAHL**, <u>Circuit Judge</u>. A jury convicted appellant Sherad Therrien on five counts of drug trafficking and one count of being a felon in possession of a firearm and ammunition. Therrien admits that he committed these offenses. However, on appeal he disputes the appropriateness of his convictions and resulting sentence based on events occurring before, during, and after his trial. Specifically, Therrien contends that (1) federal authorities engaged in outrageous misconduct during their investigation of him and withheld exculpatory evidence before trial, thus violating his due process rights; (2) the jury discovered and considered extraneous, unadmitted evidence during its deliberations, thereby violating his right to a fair trial; and (3) the district court misapplied the United States Sentencing Guidelines when it refused to decrease his offense level during sentencing, claiming he should have at least been sentenced within a range of 51 to 63 months rather than 63 to 78 months. After careful consideration, we reject Therrien's various claims of error and affirm his conviction and sentence.

## I. Facts & Background

On June 19, 2014, a federal grand jury sitting in the District of Massachusetts issued an indictment charging Therrien with five counts of distribution of cocaine or cocaine base in violation of 21 U.S.C. § 841(a) and one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C.

§ 922(g)(1).  Before trial, Therrien filed a motion to dismiss the indictment, arguing that outrageous government misconduct by federal authorities and other violations of his due process rights mandated such a result.  The district court denied that motion.  United States v. Therrien, 89 F. Supp. 3d 216 (D. Mass. 2015).  Following that denial and after a six-day trial, a jury convicted Therrien on all counts.  The trial judge then sentenced Therrien to a prison term of 72 months, followed by three years of supervised release, and ordered him to pay a $600.00 special assessment.  On appeal, Therrien makes three arguments aimed at either negating these convictions or amending his sentence.  We recite the relevant facts to each argument below.

A. *Outrageous Government Misconduct Claims*

The crux of Therrien's appeal centers on his relationship with Officer Jessica Athas, a former member of the Hampden County Sheriff's Department.  Therrien met Athas while he was incarcerated at the Hampden County House of Correction ("Hampden"), where she was a member of the Gang Intelligence Unit.[1]

In his original motion to dismiss, the facts of which he largely reiterates on appeal, Therrien alleged that he and Athas developed a close relationship, with Athas ensuring that Therrien received favorable treatment compared to other inmates

---

[1] As part of this unit, Officer Athas was tasked with identifying each inmate's gang affiliation.

- 3 -

incarcerated at Hampden.[2]  He also claimed that after he was released from prison on February 15, 2013, Athas gave her phone number to him.  Therrien asserted that the pair then engaged in intimate phone and text message conversations.  This courtship of sorts also allegedly led to in-person meetings, gift exchanges, and a sexual relationship.[3]

Therrien also claimed that Athas eventually asked him to sell drugs and a gun to Perez.  Athas purportedly told Therrien these transactions would "help her career," and in exchange allegedly agreed to help him get a driver's license and a job.  At trial, Athas articulated a different view of their relationship, claiming that she had tried to "cultivate" both Therrien and Perez as informants.  Athas admitted to communicating with both men after their release and after she had been assigned to a joint state-federal task force with the Drug Enforcement Agency ("DEA") in November 2013.  Perez, unbeknownst to Therrien, also began cooperating with the Federal Bureau of Investigation ("FBI") around this time as well.  In this capacity, he told the FBI, who later informed the task force, that he believed Therrien would sell him drugs and/or a gun.

---

[2] Therrien claimed that Athas made sure he had light supervisory details while he was in Hampden serving another sentence, and later helped secure his move to another jail.

[3] Athas, who Therrien called as a witness at trial, denied Therrien's allegation that the pair had a sexual relationship.

To this end, Therrien claimed that Athas asked him to sell drugs to Perez on six to eight different occasions, either by phone or in person. He testified that he initially resisted, but relented once Athas assured him that he would not get in trouble. Thereafter, on four different occasions between September 4, 2013 and March 28, 2014, Therrien sold narcotics, and in one instance a 9-millimeter handgun, to Perez. Law enforcement captured all four of these transactions on audio and video recordings. Athas was present in a "backup" or "subsidiary" role for at least the first two deals.

Though Athas had disclosed some of her meetings, phone conversations, and text messages with Therrien to her supervisors, none of them knew the full extent of her and Therrien's personal relationship. In fact, once Therrien's allegations came to light, the task force launched an investigation which revealed that Athas had not been entirely truthful with respect to other of the pair's communications. For that reason, the Government decided not to call her as a witness at trial. The investigation also led to her demotion and, ultimately, her resignation.

Before trial, Therrien filed a motion to dismiss his indictment based on the federal government's "outrageous misconduct," claiming that Athas had "used sex and 'feminine wiles' to induce him to sell drugs." Therrien, 89 F. Supp. 3d at 218. He also claimed that the federal government had failed to provide

him with materially exculpatory evidence as required under Brady v. Maryland, 373 U.S. 83 (1963), which failure in his view was similarly "outrageous." Therrien again focused on Athas, arguing that she "withh[eld] the nature of [their] relationship" from the prosecutor, who in turn did not disclose the evidence to him or his lawyer. See Therrien, 89 F. Supp. 3d at 219.[4] The district court denied the motion without an evidentiary hearing, holding that even if it accepted all of Therrien's factual allegations as true, the allegations did "not rise to the level of egregiousness the law requires for dismissal of an indictment." Id. at 218.[5]

B. *Jury Taint Claim*

As part of his defense, Therrien put his personal cell phone into evidence, which was present in the jury room during their deliberations. Shortly after deliberations began, the jury foreperson sent a note to the district judge which read "[w]e (one juror) turned on [Therrien's] cell phone and read some text messages before realizing it might be wrong. Is that okay?" The

---

[4] For the first time on appeal, Therrien puts forward a claim that Athas's disposal of her work cell phone constituted a due process violation under Arizona v. Youngblood, 488 U.S. 51, 58 (1988), which states that the government commits a due process violation when, in bad faith, it destroys potentially exculpatory evidence. Therrien argues that the cell phone contained exculpatory text messages which would have aided his defense.

[5] At trial, Therrien's put forth an entrapment by estoppel defense. Specifically, Therrien claimed that he had reasonably relied on Athas's assurances that he would not be held responsible for selling drugs, a firearm, and ammunition to Perez.

judge quickly decided that he needed to "find out" whether the messages were relevant to the case.  He summoned the entire jury back to open court and warned them to not read any more messages on the phone.  He then dismissed the jury but kept the jury foreperson for further questioning about the incident.  The foreperson explained that a juror had turned on a cell phone accompanying other evidence to see whether it was the same phone that Therrien had used to send text messages to Athas.  He also noted that the juror who turned on the phone had seen a single text message, one between Therrien and Athas, and that he believed a transcript of the text had already been admitted into evidence.

The next day, the judge had the juror who turned on the phone brought into open court for individual questioning.  The juror explained that after turning on the phone, she and one other juror had seen the text message.  She then immediately had turned the phone off.  Summoning all the jurors a second time, the judge again warned them not to turn on the phone.  The judge then sent the jury back for further deliberations, but this time the juror who had turned on the phone stayed behind.  The juror stated that she believed the text message she had seen was not already in evidence because it referred to a drug -- "Molly" -- that had not been discussed at trial.  After hearing this, the judge once again told the juror to disregard the text message.

Therrien moved for a mistrial, arguing that the trial judge should have polled each juror individually since it was clear that more than one juror either saw or discussed the text message. Therrien's motion also contained a list of questions for the court to ask the jury regarding how it used the phone, but did not request a curative instruction. The judge denied the motion, noting that Therrien had offered the phone into evidence without limitation and that he "believe[d] the jury w[ould] follow [his] instruction not to further inquire into it," and gave no further instruction regarding the phone. Soon after, the jury found Therrien guilty on all charges.

C. *Sentencing*

At sentencing, the district court settled on a United States Sentencing Guidelines ("U.S.S.G.") range of 63 to 78 months. The court arrived at that range after assigning Therrien a Base Offense Level ("BOL") of 20 and then adding another four levels since Therrien "transferred a firearm with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." See U.S.S.G. § 2K2.1(b)(6)(B). Therrien sought a two-level reduction, arguing that he had accepted responsibility by admitting he made the charged sales. See id. § 3E1.1(a). The district court rebuffed Therrien, sentenced him to a prison term of 72 months followed by three years of supervised release, and imposed a $600.00 special assessment.

## II. Discussion

We deal with, and reject, each of Therrien's claims of error in turn.[6]

### A. *Outrageous Government Misconduct Claims*

When reviewing a trial court's denial of a motion to dismiss an indictment, this court reviews "legal questions de novo, any factual findings for clear error, and the court's 'ultimate ruling' for abuse of discretion."  United States v. Parigan, 824 F.3d 5, 9 (1st Cir. 2016) (quoting United States v. Doe, 741 F.3d 217, 226 (1st Cir. 2013)).  The district court did not make any express factual findings, and found Therrien's claim to be deficient even if all his factual allegations were true.  Therrien, 89 F. Supp. at 218.  We do as well.

A defendant's claim of outrageous government misconduct faces a demanding standard, permitting the dismissal of criminal charges "only in those very rare instances when the government's misconduct is so appalling and egregious as to violate due process by 'shocking . . . the universal sense of justice.'"  United States v. Luisi, 482 F.3d 43, 59 (1st Cir. 2007) (quoting United States v. Russell, 411 U.S. 423, 432 (1973)).  We review these claims holistically, evaluating the "totality of the relevant

---

[6] For purposes of this opinion, we assume that Therrien's allegations accurately describe the nature and extent of his and Athas's relationship.

circumstances" while recognizing that "outrageousness, by its nature, requires an *ad hoc* determination" that cannot "usefully be broken down into a series of discrete components."[7] <u>United States</u> v. <u>Santana</u>, 6 F.3d 1, 6-7 (1st Cir. 1993) (emphasis in original). Though the defense is theoretically viable, <u>see</u> <u>United States</u> v. <u>Twigg</u>, 588 F.2d 373, 380-81 (3d Cir. 1978), it is nonetheless reserved "for only the most egregious circumstances" and should not be "invoked each time the government acts deceptively or participates in a crime that it is investigating," <u>United States</u> v. <u>Sneed</u>, 34 F.3d 1570, 1577 (10th Cir. 1994) (quoting <u>United States</u> v. <u>Mosley</u>, 965 F.2d 906, 910 (10th Cir. 1992)).

Therrien points to three categories of cases where the defendant alleged a due process violation based on outrageous government misconduct, and he claims that his case presents aspects of each type. Though almost no court evaluating cases in any of these categories has found dismissal appropriate, Therrien continues to suggest that his case presents a unique confluence of misconduct warranting the doctrine's application. We think not.[8]

---

[7] In his brief, Therrien cites to and relies on multi-factor tests used in other circuits to evaluate outrageous misconduct claims. However, we have noted that this court's holistic approach to outrageous-misconduct claims differs from other courts' analyses, which use these multi-factor tests. <u>United States</u> v. <u>Rivera-Garcia</u>, 527 Fed. App'x 11, 15 n.2 (1st Cir. 2013).

[8] For this reason, we need not and do not decide whether an indictment may be dismissed based on outrageous government misconduct in the absence of prejudice. <u>See</u> <u>United States</u> v. <u>Guzman</u>, 282 F.3d 56, 59 (1st Cir. 2002) (recognizing that a showing

First, Therrien cites cases where charges of outrageous misconduct centered on the over-involvement of government agents in the commission of a crime. See, e.g., Luisi, 482 F.3d at 59; Santana, 6 F.3d at 5. These cases hold little persuasive weight here since Athas merely encouraged Therrien to sell illicit goods and did not "engineer[]" or "direct[] the criminal enterprise from start to finish." See Sneed, 34 F.3d at 1577. Though Athas knew of Perez's status as an FBI informant and personally spoke with both Perez and Therrien before and after the sales took place, she did not supply Therrien with the drugs or firearm, did not specify the precise terms of the transactions, and was not physically present when they took place. See Twigg, 588 F.2d at 380-81 (outrageous misconduct barred conviction where a government agent set up a drug lab, supplied the key ingredient to make the drugs, purchased almost all of the other supplies, "was completely in charge" of the operation, and "furnished all of the laboratory expertise"). Indeed, Therrien's own active involvement in the crime undermines his argument: he acquired the drugs and firearm on his own and, importantly, only communicated with Athas twice over the seven-month span when the sales took place. See Luisi, 482 F.3d at 59 (noting that "an outrageousness claim might be

---

of prejudice is "of some moment" and noting that the alleged misconduct at issue "did not compromise [the defendant's] defense or prejudice his case").

defeated if a defendant has been 'too active himself'"(quoting United States v. Bradley, 820 F.2d 3, 7 (1st Cir. 1987)); United States v. Nunez, 146 F.3d 36, 38-39 (1st Cir. 1998) (denying an outrageous misconduct claim despite the government informant requesting pipe bombs from the defendant, government agents escorting the defendant to buy the raw materials for the bombs, and the government supplying the money used to buy the bombs).

Second, Therrien points to cases addressing sexual relations between defendants and government agents. We have not previously addressed whether, when, or to what extent a sexual relationship could form the basis of a successful outrageous misconduct claim. The courts of appeals that have considered this sort of claim in similar contexts, however, note that it would succeed only if the government "consciously set out to use sex as a weapon in its investigatory arsenal" or at least "acquiesce[d] in such conduct for its own purposes upon learning that such a relationship existed." United States v. Cuervelo, 949 F.2d 559, 567 (2d Cir. 1991); accord United States v. Dyess, 478 F.3d 224, 235 (4th Cir. 2007) (adopting Cuervelo standard); United States v. Nolan-Cooper, 155 F.3d 221, 233 (3d Cir. 1998) (rejecting outrageous misconduct claim where only one incident of sexual intercourse occurred between a law enforcement officer and the defendant which "was not necessarily intertwined with [the defendant's] offense conduct"); United States v. Simpson, 813 F.2d

1462, 1466 (9th Cir. 1987) (noting that "the deceptive creation and/or exploitation of an intimate relationship," on its own, does not constitute outrageous government misconduct).

Here, besides Therrien's own testimony, there was no evidence that federal authorities directed Athas, a state law enforcement officer, to start a sexual relationship with Therrien. None of Athas's supervisors knew about the extent of her personal relationship with Therrien, the alleged sexual relationship was of a limited duration, and it is unclear whether Athas's motive for entering into any such relationship was for "investigatory" reasons. In other words, Therrien never alleged that the FBI or any other investigative agency encouraged, or even "acquiesce[d]" to, his and Athas's relationship. See Cuervelo, 949 F.2d at 567. Consequently, we cannot conclude that Athas's alleged conduct was attributable to the federal government. See Simpson, 813 F.2d at 1467 (concluding that an informant's "initial decision to establish a deceptive sexual and emotional relationship" could not "be used to characterize the *government's* conduct" as outrageous (emphasis in original)).

Third, Therrien directs us to another set of cases involving certain defendants' allegations that government agents physically or psychologically abused them. See, e.g., Santana, 6 F.3d at 4. Therrien specifically argues that Athas's age, position of authority at Hampden, and repeated assurances that he would not

get in trouble for selling illicit items to Perez constituted such abuse. Nevertheless, we do not see how this dynamic implicates due process concerns since "feelings of 'betrayal' are not the sort of injuries that constitute a violation of a defendant's rights under the Due Process Clause." See United States v. Chin, 934 F.2d 393, 399 n.4 (2d Cir. 1991); see also Simpson, 813 F.2d at 1466 (concluding that the Due Process Clause "does not protect [an individual] from voluntarily reposing his trust in one who turns out to be unworthy of it").

Therrien's argument next ventures toward a different type of outrageous government misconduct, claiming that Athas, and therefore the federal government, violated his due process rights after failing to disclose the true extent of her relationship with Therrien to the prosecution and, in turn, to him. See Brady, 373 U.S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). The district court, however, correctly dismissed this argument out of hand:

> To constitute a Brady violation, the material evidence at issue "must have been either willfully or inadvertently suppressed by the government." United States v. Alverio-Melendez, 640 F.3d 412, 424 (1st Cir. 2011). It is well established that "[i]n general, 'evidence is not suppressed if the defendant either knew, or should have known of the

- 14 -

> essential facts permitting him to take advantage of any exculpatory evidence.'"  Ellsworth v. Warden, 333 F.3d 1, 6 (1st Cir. 2003) (quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982), cert. denied, 459 U.S. 1174 (1983)).  Therrien, of course, had actual knowledge of the nature of his relationship with Athas.  Because he knew of the essential facts permitting him to take advantage of the exculpatory information, there is no suppressed evidence regarding the relationship that the government was obligated to disclose.

Therrien, 89 F. Supp. 3d at 218.[9]

Finally, Therrien argues for the first time on appeal that Athas's disposal of her work cell phone, which he claims contained exculpatory text messages between him and Athas, also constituted a due process violation.  See Youngblood, 488 U.S. at 58 (holding that the government commits a due process violation when, in bad faith, it destroys "potentially useful evidence").  The argument, however, lacks merit.

Even assuming that Therrien has not forfeited the claim and that Athas destroyed her phone in bad faith, a dubious conclusion based on the record,[10] Therrien remained a party to the text message conversations between himself and Athas.  At best, it

---

[9] We express no opinion regarding whether a Brady violation, on its own, may in some cases meet the outrageous government misconduct standard.

[10] Athas, for her part, testified that she handed the phone in to the Hampden Sheriff's Department for decommissioning after it stopped working in late 2014, and that Hampden's informal policy was such that Athas had to turn the phone in for disposal anyway once the DEA, as opposed to the Sheriff's Department, became responsible for paying her phone bill around the same time.

remains unclear whether these text messages actually had any exculpatory value. At trial, Therrien introduced extensive evidence concerning his relationship with Athas, including her testimony, his own testimony, and text messages from his own cell phone. He has not, however, shown on appeal *how* the text messages on Athas's phone would differ from this considerable pool of existing evidence. See United States v. Sepulveda, 15 F.3d 1161, 1195 (1st Cir. 1993) (noting the government's destruction of "potentially exculpatory evidence" may not violate Brady or Youngblood if the evidence can be "replicated through other sources").

Considering everything raised by Therrien, the totality of these circumstances does not present the rare case where any government misconduct was sufficiently blatant, outrageous, or egregious to warrant the dismissal of his indictment.

B. *Jury Taint Claim*

Therrien next maintains that the trial court did not adequately inquire into the existence and extent of any prejudice he suffered after at least two jurors viewed a text message on his phone. The trial court abused its discretion, he continues, by denying Therrien's motion for a mistrial without conducting such an inquiry. We disagree.

Where "a colorable claim of jury taint surfaces during jury deliberations, the trial court has a duty to investigate the

- 16 -

allegation promptly." United States v. Bradshaw, 281 F.3d 278, 289 (1st Cir. 2002). In these circumstances, the trial court is tasked with determining whether a taint-producing event actually occurred and, if so, the extent or pervasiveness of the resulting prejudice. See United States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990). If the trial court finds both a taint-producing event and a significant potential for prejudice, it must then consider possible measures to alleviate that prejudice. Bradshaw, 281 F.3d at 289. If the potential for prejudice remains too high even after the trial court's best efforts, then the court must grant any resulting motion for a mistrial. Id.

Granting a defendant's request for a mistrial is "a last resort, only to be implemented if the [jury] taint is ineradicable." Sepulveda, 15 F.3d at 1184. When reviewing the denial of a mistrial request, we therefore "consider the totality of the circumstances to determine whether the defendant has demonstrated the kind of clear prejudice that would render the court's denial of his motion for a mistrial a manifest abuse of discretion." United States v. Trinidad-Acosta, 773 F.3d 298, 306 (1st Cir. 2014) (quoting United States v. Dunbar, 553 F.3d 48, 58 (1st Cir. 2009)). The trial court enjoys similar discretion regarding how it conducts its inquiry into claims of jury taint. See United States v. Yeje-Cabrera, 430 F.3d 1, 11 (1st Cir. 2005).

We discern no abuse here. Therrien primarily attacks the trial court's procedural choices, arguing that it should have (a) polled the entire jury to determine who saw the text message and assess the degree of any resultant prejudice, or (b) issued a curative instruction or discharged the juror who viewed the text message. Nonetheless, these procedures are usually reserved for far graver and pervasive claims of jury taint.[11] Here, the trial court, after learning about the incident, isolated both the foreperson and the juror who turned on the cell phone, questioned each of them about what they had seen on the cell phone and who else had seen it, and then repeatedly told the jury to disregard

---

[11] See United States v. Lara-Ramirez, 519 F.3d 76, 86 (1st Cir. 2008) (concluding that the trial court abused its discretion by granting a motion for a mistrial where, after learning that some members of the jury may have been consulting a Bible not entered into evidence during deliberations, the judge did not ascertain whether any specific portions of the Bible had actually been read, referred to, or discussed by the jurors); Bradshaw, 281 F.3d at 282, 290-92 (affirming as appropriate, after an unredacted copy of an indictment charging the defendant with three severed counts involving "serious malefactions" found its way into the jury room, the trial court's individual *voir dire* of each juror, its dismissal of one juror, and its issuance of a curative instruction); United States v. Gaston-Brito, 64 F.3d 11, 13 (1st Cir. 1995) (stating the trial court abused its discretion after it denied a mistrial motion without conducting any investigation into whether a non-witness had made an impermissible hand gesture or whether the jury had seen it); see also Jackson v. United States, 97 A.3d 80, 82-83 (D.C. 2014) (endorsing, after the entire jury had perused emails, texts, call logs, and contact lists on a cell phone not admitted into evidence, the trial court's denial of a mistrial since the judge had assembled and questioned the entire jury three times to assess existence, extent, and prejudicial effects of the taint-producing event).

the texts and not turn the cell phone on again.  Given the circumstances, we are reassured that the trial court's inquiry and repeated warnings effectively ascertained the extent and degree of any prejudice suffered by Therrien, mitigated the effects of that prejudice, and was "appropriate and reasonable."  See United States v. Balsam, 203 F.3d 72, 86 (1st Cir. 2000); see also United States v. Arias-Montoya, 967 F.2d 708, 714 (1st Cir. 1992) (concluding it was "highly probable" that the erroneous admission of a defendant's prior conviction "did *not* contribute to the verdict against him" and that the trial court "properly cautioned the jury as to the limited weight to be given the prior conviction") (emphasis in original).[12]

## C. *Sentencing*

Therrien's final argument, that he is entitled to a reduction in his sentence because he "clearly demonstrate[d] acceptance of responsibility for his offense," see U.S.S.G. § 3E1.1(a), also lacks merit.  Therrien bears the burden of proving his entitlement to an acceptance-of-responsibility credit, and "the sentencing court's determination to withhold the reduction will be overturned only if it is clearly erroneous." United States v. Franky-Ortiz, 230 F.3d 405, 408 (1st Cir. 2000) (quoting United

---

[12] Because we conclude that the trial court's procedures were appropriate and reasonable, we need not address the Government's threshold argument that the incident was not clearly prejudicial.

States v. Ocasio-Rivera, 991 F.2d 1, 4 (1st Cir. 1993)); see also United States v. Marino, 833 F.3d 1, 8 (1st Cir. 2016) (stating that clear error "means the judge got things 'wrong with the force of a 5 week old, unrefrigerated, dead fish'") (quoting In re O'Donnell, 728 F.3d 41, 46 (1st Cir. 2013)).

Therrien rightly points out that § 3E1.1's commentary suggests that these determinations "will be based primarily upon pre-trial statements and conduct." U.S.S.G. § 3E1.1 cmt. n.2. Similarly, the commentary recognizes that in some "rare situations" a defendant may stand trial and still receive an acceptance of responsibility reduction. Id. But while it is "remotely conceivable . . . that a defendant who goes to trial with an entrapment defense might still be entitled to such a reduction," Therrien's "decision to defend himself at trial through a weak claim of entrapment in no way places him in this narrow theoretical category." See United States v. Turner, 501 F.3d 59, 74 (1st Cir. 2007); see also United States v. Sánchez-Berríos, 424 F.3d 65, 79 (1st Cir. 2005); United States v. Capleton, 350 F.3d 231, 245 (1st Cir. 2003).

Therrien argues that our previous decisions involved traditional entrapment claims and that his "entrapment by estoppel" defense somehow warrants a different outcome. This latter defense, however, only requires that the defendant admit "that he had been told by a government official that his behavior

was legal and that he reasonably relied on that advice." United States v. Bunnell, 280 F.3d 46, 49 (1st Cir. 2002). Though it may acknowledge that a defendant committed an unlawful act, the defense still renounces any notion of personal responsibility for those acts and redirects it to law enforcement. See United States v. Mikutowicz, 365 F.3d 65, 76-77 (1st Cir. 2004) (holding that acceptance of responsibility reduction was improper where the defendant contested the willfulness of his conduct, an "essential factual element[] of guilt" (quoting U.S.S.G. § 3E1.1 cmt. n. 2)). For these reasons, we conclude that the district court did not commit any error, let alone clear error, in denying Therrien a sentencing reduction for acceptance of responsibility.[13]

### III. Conclusion

Therrien's conviction and his resulting sentence are AFFIRMED.

---

[13] Therrien suggests that the district court also erred by not stating why it declined to apply the acceptance-of-responsibility credit. The answer to this question, however, is clear from the record: at the sentencing hearing, the district court pointed out that the "theory of [Therrien's] case" was inconsistent with "what the jury [had] found." See United States v. Stella, 591 F.3d 23, 28 (1st Cir. 2009) (stating that the district court did not need to go into detail regarding why it imposed a sentencing enhancement because "the reason [was] evident from the record").